1

2

3

4                  UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   ANTHONY P.X. BOTHWELL,                 Case No.  13-cv-05439-JSC
                      Plaintiff,
8           v.

9   CENTRAL INTELLIGENCE AGENCY,           **ORDER GRANTING DEFENDANT'S**
                      Defendant.           **MOTION FOR SUMMARY JUDGMENT**
10                                          **IN PART AND DEFERRING**
                                           **JUDGMENT IN PART.**
11

12

13          Plaintiff Anthony P.X. Bothwell ("Bothwell"), an attorney proceeding *pro se*, brings this

14  action against Defendant Central Intelligence Agency ("CIA") for its alleged noncompliance with

15  Bothwell's requests for information under the Freedom of Information Act ("FOIA"), 5 U.S.C.

16  section 552.  Bothwell seeks an order compelling the release of information related to individuals

17  purportedly connected to the assassinations of President John F. Kennedy and Senator Robert F.

18  Kennedy.  (Complaint at 5–6.)  Now pending before the Court is the CIA's motion for summary

19  judgment.  (Dkt. No. 28.)  After carefully considering the parties' submissions, and having had the

20  benefit of oral argument on October 2, 2014, the Court concludes that it does not have enough

21  information to rule on whether the CIA's search was adequate, but that the CIA issued a proper

22  "Glomar Response" under Exemption 3 of the FOIA.  The Court therefore GRANTS the CIA's

23  motion for summary judgment in part and DEFERS judgment in part.

24                              **BACKGROUND**

25          On February 11, 2009, Bothwell filed a FOIA request, reference number F-2009-00630

26  ("February Request"), with the CIA seeking:

27              [1] All records within the possession, custody, or control of the CIA,
                generated in July 1976 that relate to Johnny ROSELLI, a.k.a. John
28              ROSELLI, a.k.a. Filippo SACCO.

*United States District Court*
*Northern District of California*

[2] All records within the possession, custody, or control of the CIA, generated in October 1963 that relate to Jean SOUETRE, a.k.a. Michel ROUX, a.k.a. Michel MERTZ.

[3] All records within the possession, custody, or control of the CIA, generated in October 1963 that relate to both David MORALES and President John F. KENNEDY.

(Dkt. No. 28-1 Ex. 1.)

The CIA responded to the February Request.  (Dkt. No. 28-1 Ex. 2.)  As to the first item, the CIA stated that it had performed a search within a database of previously released records concerning Mr. Roselli, and found "no documents pertaining to Mr. Roselli that were generated in July 1976."  (*Id.*)  In response to the second item, the CIA acknowledged the existence of previously released material regarding the expulsion of Mr. Souetre from the United Stated in November 1963, but apart from that, could "neither confirm nor deny the existence or nonexistence of records responsive to [Bothwell's] request."[1]  (*Id.*)  The CIA cited FOIA exemptions (b)(1) ("Exemption 1") and (b) (3) ("Exemption 3"), as well as Section 3.6(a) of Executive Order ("EO") 12958 and Section 6 of the Central Intelligence Agency Act ("CIA Act"), as the bases for this Glomar Response.  (*Id.*)  As to the third item, the CIA acknowledged that it had received previous requests for records on Mr. Morales, but that "[n]o previously released documents were generated in October 1963."  (*Id.*)

Bothwell timely appealed to the CIA's Agency Release Panel on the grounds that the CIA's April 9 letter was not responsive to his original requests.  (Dkt. No. 28-1 Ex. 3.)  Bothwell argued that his FOIA request asked for all records, not simply those that had been previously released.  (*Id.*)  As to the Glomar Response, Bothwell implored the CIA to declassify any October 1963 records on Mr. Souetre on the grounds that:

[a] such records more than 45 years old would not be adverse to any legitimate current government interest in protecting intelligence sources and methods; and [b] there is overwhelming public interest in the disclosure of such records, as they would enhance public

---

[1] This type of response from the CIA — the refusal to confirm or deny the existence of records — is known as a "Glomar Response."  *Hunt v. CIA*, 981 F.2d 1116, 1118 (9th Cir. 1992); *see also Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976) (upholding the CIA's refusal to confirm or deny existence of records of CIA connection to activities of ship named the Hughes Glomar Explorer).

United States District Court
Northern District of California

1    understanding of historical events related to the assassination of
     President Kennedy.

2    (*Id.*)

3        The CIA accepted the appeal and took Bothwell's request under further consideration.

4    (Dkt. No. 28-1 Ex. 4.)

5        While the CIA was considering Bothwell's appeal, he made a second FOIA request,

6    reference number F-2009-01427 ("July Request"), seeking:

7        [1] All records within the possession, custody, or control of the CIA,
         generated in May through July 1968, that relate to Thane Eugene
8        CESAR.

9        [2] All records within the possession, custody, or control of the CIA,
         generated in May through July 1968, that relate to Enrique
10       HERNANDEZ, a.k.a. Hank HERNANDEZ.

11   (Dkt. No. 28-1 Ex. 5.)

12       The CIA informed Bothwell that the July Request would be placed on hold pending receipt

13   of biographic information and evidence of death or a privacy waiver for Cesar and Hernandez.

14   (Dkt. No. 28-1 Ex. 6.)  Bothwell subsequently provided the CIA with additional information.

15   (Dkt. No. 28-1 Ex. 7.)

16       In September 2009, the CIA issued a response to the July Request.  (Dkt. No. 28-1 Ex. 8.)

17   The CIA cited the CIA Information Act, 50 U.S.C. section 431, as exempting operational files

18   from the disclosure requirements of the FOIA.  (*Id.*)  To the extent that Bothwell's request was

19   subject to the FOIA, however, the CIA claimed that it did not locate any CIA-originated records

20   responsive to Bothwell's request.  (*Id.*)  Bothwell did not appeal the CIA's decision on the July

21   Request.  (Dkt. No. 24 at 2.)

22       Bothwell commenced the instant action on November 22, 2013, alleging that the CIA

23   improperly withheld documents concerning Roselli, Souetre, Morales, Cesar, and Hernandez, and

24   that the CIA failed to consider his appeal of the February Request.  (Complaint ¶¶ 19–20.)

25   Bothwell seeks an order compelling the CIA to release said records to both him and the public.

26   (*Id.* at 5–6.)

27       Both parties subsequently agreed to a temporary stay in the litigation.  (Dkt. No. 24 at 2.)

28   In the joint stipulation, Bothwell agreed to exhaust his administrative remedies with regards to the

3

1    July Request by submitting a written appeal.  (*Id.*)  In turn, the CIA agreed to process the appeals

2    of both FOIA requests in its May 2014 Appeals Board meeting, with the clarification that the

3    appeal for the February Request would include the date range in the original request (July 1976)

4    rather than the appeal request (June 1976).  (*Id.*)  The CIA stated that it would notify Bothwell of

5    the results of both appeals by June 10, 2014.  (*Id.* at 3.)

6        On June 10, 2014, the CIA denied both appeals in full.  (Dkt. No. 28-1 Exs. 9–10.)  In

7    response to the February Request, the CIA determined that it was unable to locate any responsive

8    records on Roselli or Morales.  (Dkt. No. 28-1 Ex. 9.)  Regarding Souetre, the CIA once again

9    asserted a Glomar Response, claiming Exemptions 1 and 3 of the FOIA on the grounds that the

10   existence or nonexistence of such records is classified and relates to intelligence sources and

11   methods protected from disclosure under Section 6 of the CIA Act and Section 102A(i)(1) of the

12   National Security Act ("NSA").  (*Id.*)  In response to the July Request, the CIA determined that it

13   was unable to locate any responsive records on Cesar or Hernandez.  (Dkt. No. 28-1 Ex. 10.)

14       The CIA moved for summary judgment on August 11, 2014.  (Dkt. No. 28.)  In support of

15   its motion, the CIA submitted an affidavit from Martha M. Lutz ("Lutz Declaration"), the Chief of

16   the Litigation Support Unit of the CIA.  (Dkt. No. 28-1) ("Lutz Decl.")  Bothwell filed his

17   opposition on September 2, 2014.  (Dkt. No. 29.)  The CIA's motion is now before the Court for

18   adjudication.

19                              **LEGAL STANDARD**

20       The FOIA calls for "broad disclosure of Government records."  *CIA v. Sims*, 471 U.S. 159,

21   166 (1985).  In order to ensure broad disclosure, the FOIA "gives individuals a judicially-

22   enforceable right of access to government agency documents."  *Lion Raisins v. Dep't of Agric.*,

23   354 F.3d 1072, 1079 (9th Cir. 2004); 5 U.S.C. § 552.  The FOIA specifically provides, inter alia,

24   that: "each agency, upon any request for records which (i) reasonably describes such records and

25   (ii) is made in accordance with published rules stating the time, place, fees (if any), and

26   procedures to be followed, shall make the records promptly available to any person."  5 U.S.C. §

27   552(a)(3)(A).

28

4

"Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved." *Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1094 (C.D. Cal. 2005). The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Unlike typical summary judgment analysis, however, "in a FOIA case, we do not ask whether there is a genuine issue of material fact, because the facts are rarely in dispute." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996).

In a FOIA case, courts are permitted to rule on summary judgment "solely on the basis of government affidavits." *Lion Raisins*, 354 F.3d at 1082. To prevail on summary judgment, "the government must establish that its search for responsive documents was reasonable and that it has described with reasonable specificity the nature of [any] responsive documents." *Hiken v. U.S. Dep't of Def.*, 521 F. Supp. 2d 1047, 1054 (N.D. Cal. 2007). The government may also avoid disclosure if it submits "a detailed affidavit showing that the information logically falls within one of the claimed [FOIA] exemptions." *Minier*, 88 F.3d at 800.

## DISCUSSION

The CIA relies on the Lutz Declaration to contend that: (1) it conducted a reasonable and adequate search for responsive records on Roselli, Morales, Cesar, and Hernandez; and (2) its Glomar Response to the Souetre request was proper under FOIA Exemptions 1 and 3. (Dkt. No. 28 at 1–2.) Bothwell, in opposition, argues that: (1) the CIA conducted a deficient search for records on Roselli, Morales, Cesar, and Hernandez; and (2) the CIA's Glomar Response is fatally flawed. (Dkt. No. 29 at 10, 16.) The Court will address each issue in turn.

### A.    Adequacy of the Search

In the FOIA context, the agency responding to a request has the burden of sustaining the adequacy of its response by demonstrating that it did not improperly withhold records subject to disclosure under the FOIA. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). The agency must "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Citizens Comm'n on Human Rights v.*

5

*Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995).  The "issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."  *Id.* (emphasis in original) (internal citations and quotation marks omitted).

The "adequacy of the search . . . is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  *Zemansky v. U.S. EPA*, 767 F.2d 569, 571 (9th Cir. 1985).  "In demonstrating the adequacy of the search, the agency may rely upon *reasonably detailed*, nonconclusory affidavits submitted in good faith."  *Id.* (emphasis added).  Thus, a district court "may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Grand Cent. P'ship., Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (emphasis in original) (internal citations and quotation marks omitted).

As to the requested records on Roselli, Morales, Cesar, and Hernandez, the CIA claims that it conducted a "thorough search reasonably calculated to uncover responsive records" to Bothwell's FOIA request.  Bothwell argues that the search was deficient because: (1) the CIA has given contradictory explanations; (2) the search did not include unacknowledged affiliations; and (3) the CIA should have searched paper records and its Miami Station for responsive records.

### 1. The CIA's Search

The Lutz Declaration explains the CIA's procedures for processing FOIA requests.  (Lutz Decl. ¶¶ 19–31.)  All FOIA requests sent to the CIA are first submitted to Information Management Services.  (*Id.* ¶ 20.)  Information Review and Release Analysts ("IRRAs") conduct an initial search through several databases to determine whether the CIA has previously released any records that would be responsive to the request.  (*Id.* ¶ 20.)  If no responsive documents are found, the IRRA must determine which of the CIA's five directorates or office clusters might reasonably be expected to have responsive records: the National Clandestine Service ("NCS"), the Directorate of Intelligence ("DI"), the Directorate of Science and Technology ("DS&T"), the Directorate of Support ("DS"), and the Director of CIA Area ("DIR Area").  (*Id.* ¶ 22.)  Each

1   directorate has Information Review Officers ("IROs") who work with relevant personnel to

2   configure a search strategy for each FOIA request.  (*Id.* ¶ 29.)

3          In Bothwell's case, the IRRAs determined that the NCS and the DS were the directorates

4   reasonably likely to possess documents responsive to Bothwell's FOIA requests.  (*Id.* ¶ 32.)  The

5   NCS was chosen because it is the directorate "responsible for the clandestine collection of foreign

6   intelligence from human sources."  (*Id.* ¶ 33.)  The DS was chosen because it "houses the

7   personnel and physical security functions of the CIA and would be most likely to contain records

8   of individuals who were applicants, contractors, or employees of the CIA."  (*Id.* ¶ 34.)  No other

9   directorates were chosen because Bothwell's FOIA requests made no indication that the subjects

10  of his requests had a connection to CIA intelligence analysis, the Director's office, or CIA

11  intelligence technology that would lead to responsive files in the DI, DS&T, or DIR Area,

12  respectively.  (*Id.* ¶ 35.)

13         Lutz maintains that the NCS conducted a "search of its system of records that was

14  reasonably calculated to discover any records responsive" to Bothwell's FOIA requests, including

15  "searches of the component's electronic database system using the names (including aliases)

16  provided in the . . . requests."  (*Id.* ¶ 33.)  "The NCS did not locate any records *that reflected an*

17  *open and acknowledged CIA affiliation* and were responsive to [Bothwell]'s FOIA requests."  (*Id.*)

18  (emphasis added).

19         Lutz similarly maintains that the DS "conducted a search of its system of records that was

20  reasonably calculated to discover any records responsive" to Bothwell's FOIA requests, including

21  "searches of the component's electronic database systems using the names (including aliases)

22  provided in the . . . requests."  (*Id.* ¶ 34.)  "The DS did not locate any records that were responsive

23  to [Bothwell]'s requests."  (*Id.*)

24         The CIA additionally searched a database of records that were collected under the John F.

25  Kennedy Assassination Records Collection Act of 1992, 44 U.S.C. section 2107 note ("JFK Act"),

26  which required the CIA to "review, identify, and organize every record in [its] possession related

27  to the assassination of President Kennedy."  (*Id.* ¶ 36.)  That database contains indexing

28  information "for about 1,100 additional documents that have not yet been publicly released."  (*Id.*

United States District Court
Northern District of California

7

¶ 37.)  In response to Bothwell's requests, the IRRAs "searched the database of assassination-related records for each of the names (including aliases) provided in the FOIA requests."  (*Id.*)  "They searched the database's indexing information to identify records that might relate to the subjects, then manually reviewed any hits for responsiveness."  (*Id.*)  "Those searches turned up no responsive documents."  (*Id.*)

### 2.   Sufficiency of the Lutz Declaration

A CIA affidavit that "lays out in detailed fashion: (1) the files that were searched; (2) the reasons for searching those files; (3) the search terms employed; and (4) the search method used" is sufficient to show "that the search was reasonable and thorough both in time and method." *Porter v. CIA*, 778 F. Supp. 2d 60, 69 (D.D.C. 2011); *see also Lawyers' Comm. for Civil Rights v. U.S. Dep't of the Treasury*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008) ("[A]ffidavits or declarations submitted by the agency . . .  must describe what records were searched, by whom, and through what processes.") (internal citations and quotation marks omitted).

On the other hand, a conclusory affidavit "that generally asserts adherence to the reasonableness standard . . . is insufficient to carry the CIA's burden on summary judgment to prove that no substantial and material facts are in dispute and that it is entitled to judgment as a matter of law."  *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (internal citations, brackets, and quotation marks omitted); *see also Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (holding that an agency's affidavit must provide enough detail to "afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.").  The description of a CIA's search is inadequate where the affidavit fails to "explain in reasonable detail the scope and method of the search conducted by the agency sufficient to demonstrate compliance with the obligations imposed by the FOIA."  *Morley*, 508 F.3d at 1122 (internal citations, brackets, and quotation marks omitted).

The Lutz Declaration thoroughly describes how the CIA processes FOIA requests and reasonably explains why the NCS and DS processed the search instead of other directorates.  (Lutz Decl. ¶¶ 19-31, 33-35.)  At oral argument, Bothwell claimed that the CIA should not have limited

United States District Court
Northern District of California

United States District Court
Northern District of California

the scope of its search to the NCS and the DS,[2] and that it should have also searched for records within its Directorate of Plans or Directorate of Operations.  Neither of these were identified as one of the five CIA directorates in the Lutz Declaration.  (Lutz Decl. ¶ 22.)  Upon further research, however, the Court learned that the NCS was formerly known as the Directorate of Plans until 1973 and as the Directorate of Operations from 1973 to 2005.[3]  Thus, the search of the NCS database encompassed the directorates that Bothwell contends the CIA should have searched.

The description of the final search itself, however, is brief and couched in conclusory language adhering to reasonableness.  (Lutz Decl.  ¶¶ 33–34.)  Affidavits describing a search "must detail files searched and the general scheme of the agency file system."  *Rashad Ahmad Refaat El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 300 (D. Conn. 2008) (internal citations and quotation marks omitted); *Church of Scientology v. IRS*, 792 F.2d 146, 151 (D.C. Cir. 1986) ("Summary judgment . . . require[s] an affidavit reciting facts which enable the District Court to satisfy itself that all appropriate files have been searched, . . . . [s]uch an affidavit would presumably identify the searched files and describe at least generally the structure of the agency's file system which makes further search difficult."); *Rabin v. U.S. Dep't of State, CIA*, 980 F. Supp. 116, 120 (E.D.N.Y. 1997) (same).  "[A]morphous terms like 'relevant records systems' and 'all files reasonably likely to contain responsive materials,'" are not sufficiently detailed "without any explanation of how the agency determined which records systems and files were relevant."  *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 154 (D.D.C. 2013); *see also Oglesby*, 920 F.2d at 68 (holding that "reasonably specific" affidavits should "set[] forth the search terms and the type of

---

[2] Bothwell argued that the CIA searched the Directorate of Intelligence ("DI") rather than the Directorate of Support ("DS"), but this assertion is not consistent with the record.

[3] The CIA's Directorate of Plans was established on August 1, 1952, and was renamed the Directorate of Operations on March 1, 1973.  The Directorate of Operations was then incorporated into the National Clandestine Service ("NCS") upon the creation of the NCS on October 13, 2005. *See Key Events in CIA History*, Central Intelligence Agency, *available at* https://www.cia.gov/library/publications/additional-publications/the-work-of-a-nation/history/key-events.html (last visited Oct. 2, 2014); Press Release, Central Intelligence Agency, Establishment of the National Clandestine Service (Oct. 13, 2005), *available at* https://www.cia.gov/news-information/press-releases-statements/press-release-archive-2005/pr10132005.html.

1    search performed, and aver[] that all files likely to contain responsive materials (if such records

2    exist) were searched.").

3          In describing the final search, Lutz posits that both the NCS and the DS searched their

4    record systems in a manner "that was reasonably calculated to discover any [responsive] records."

5    (Lutz Decl.  ¶¶ 33–34.)  The only specifics that Lutz provides, however, is that the CIA conducted

6    "searches of [each] component's electronic database systems using the names (including aliases)

7    provided in the . . . requests."  (*Id.*)  This short sentence does not "detail [the] files searched [or]

8    the general scheme of the agency file system."  *See El Badrawi*, 583 F. Supp. 2d at 300.  The "two

9    brief paragraphs in the [Lutz] Declaration explaining the search itself . . . provide no information

10   about the search strategies of the components charged with responding to [Bothwell]'s FOIA

11   request."  *See Morley* 508 F.3d at 1122.

12         Thus, while the Lutz Declaration provides sufficient detail regarding CIA FOIA

13   procedures and the rationale behind searching the NCS and DS, the description of the CIA's final

14   search lacks the detail "necessary to afford [Bothwell] an opportunity to challenge the adequacy of

15   the search."  *See id.*  It does not name the databases searched by the NCS and DS, nor does it

16   provide a scheme of the database systems or any details of the final search strategy other than the

17   use of names.  This lack of clarity is compounded by some of the inconsistencies and ambiguities

18   that Bothwell identifies in Lutz's description of the search results, as discussed below, and

19   precludes the Court from granting summary judgment in the CIA's favor.

20                **3.      Bothwell's Contentions**

21         Bothwell challenges the CIA's search primarily on the grounds that: (1) the CIA has given

22   contradictory explanations for its refusal to produce records; (2) the search did not include

23   documents that reflected an unacknowledged affiliation; and (3) the CIA should have searched

24   paper records and its Miami Station for responsive records.  The Court will address each argument

25   in turn.

26                *i.      Contradictory Explanations*

27         First, Bothwell asserts that the CIA has provided contradictory responses to his request for

28   records "within the possession, custody or control of the CIA."  (Dkt. No. 29 at 16–17.)  Bothwell

                                              10

United States District Court
Northern District of California

focuses on the fact that through his FOIA appeal, the CIA had stated that it had found no "previously released" and "CIA-originated records." (*Id.* at 16.) The CIA uses different language in the Lutz Declaration, which concludes that the CIA did not "locate any" records on Roselli, Morales, Cesar, and Hernandez, and specifically states that "[t]he DS did not locate any records that were responsive to [Bothwell]'s requests." (Lutz Decl. ¶¶ 69, 34.) For the search conducted by the NCS, however, Lutz states that the CIA "did not locate any records *that reflected an open and acknowledged CIA affiliation* and were responsive to [Bothwell]'s FOIA requests." (*Id.* ¶ 33) (emphasis added). According to Bothwell, these different explanations are conflicting and, as a result, the Lutz Declaration is not credible. (Dkt. No. 29 at 17.)

When read in conjunction with the results from the DS search, the caveat added to the results from the NCS search can suggest to a reasonable reader that the CIA did find responsive documents of clandestine nature. Apart from this parsing of language, however, Bothwell does not explain what is contradictory about the CIA's earlier responses to his FOIA requests. While it has articulated its responses differently, at all times the CIA has maintained that it has found no responsive records. Thus, there are no explicit contradictions in the CIA's responses that impugn the credibility of the CIA or the Lutz Declaration. Nevertheless, the different language used for the NCS and DS searches does create an ambiguity as to whether the CIA searched for records reflecting unacknowledged affiliations, as discussed below.

### ii.     *Records with Unacknowledged Affiliations*

Bothwell additionally contends that the aforementioned language on the NCS search implies that the CIA made no effort to search for documents that reflected an unacknowledged affiliation with the CIA, even though such documents were within the scope of his original request. (Dkt. No. 29 at 18.) In her supplemental declaration, however, Lutz claims that the searches conducted "were not limited only to records that would reflect an open and acknowledged affiliation between the CIA and the subjects of [Bothwell]'s FOIA requests." (Supl. Lutz Decl. ¶ 8.) She maintains the NCS and DS searched their electronic databases "without regard for whether any responsive records contained within them would reflect an open connection or an unacknowledged affiliation." (*Id.*)

United States District Court
Northern District of California

What Lutz fails to clarify, however, is the reason behind the limitation placed on the NCS's search results in her original affidavit.  It is inconsistent to claim that the NCS's search was "not limited only to records that would reflect an open and acknowledged affiliation," when the CIA initially stated that its search "did not locate any records that reflected an open and acknowledged CIA affiliation."  (*Compare* Supl. Lutz Decl. ¶ 8 *with* Lutz Decl. ¶ 33.)  This inconsistency is exacerbated when the NCS search is compared with the statement that the DS simply "did not locate any records that were responsive."  (Lutz Decl. ¶ 34.)

The CIA offers no explanation for why Lutz's original affidavit implied that the NCS search was limited to records reflecting an open an acknowledged affiliation.  Without a proper explanation, the Court cannot grant summary judgment in the CIA's favor.

### iii.    *Paper & Miami Station Records*

Lastly, Bothwell argues that the CIA should submit an additional declaration to clarify whether the CIA's search included paper records, and that "[t]he CIA should be required to search records of its Miami Station and any other field offices likely to have responsive records" on Morales.  (Dkt. No. 29 at 19–20.)

In response, Lutz's supplemental declaration states that the "CIA searches did not categorically exclude paper records."  (Supl. Lutz Decl. ¶ 4.)  Rather, the CIA claims that it searched "a CIA database" that consists of compiled indexes of archived paper records, and that it is standard CIA FOIA practice to retrieve and review the archived paper files whenever the indexes "suggest the existence of paper files likely to contain records responsive to a particular FOIA request."  (*Id.*)  Lutz maintains that "these indexes were searched and no files were identified likely to contain responsive documents."  (*Id.*)

What Lutz fails to explain, and what the CIA could not clarify at oral argument, is what exactly this "CIA database" is.  It is unclear if Lutz is referring to the JFK database, one of the databases within the NCS or DS, or whether she is referring to an entirely new database that was not mentioned in her initial declaration.  Moreover, Lutz includes no discussion or explanation of how the files are indexed, or why none of this information was included in her original declaration.  In short, Lutz's attempt to clarify the scope of the search for paper records fails to

United States District Court
Northern District of California

"detail [the] files searched [or] the general scheme of the agency file system." *See El Badrawi*, 583 F. Supp. 2d at 300.  Thus, the Court cannot grant summary judgment for the CIA without receiving further clarification.

Bothwell also contends that the CIA should be obligated to search its Miami Station records because sources indicate that Morales was the chief of operations of the CIA Miami Station in 1963.  Yet, "[t]here is no requirement that an agency search every record system." *Oglesby*, 920 F.2d at 68; *Porter*, 778 F. Supp. 2d at 69.  The agency is only required to search those records that are *likely* to have responsive documents.  *Porter*, 778 F. Supp. 2d at 69.  The CIA correctly points out that Bothwell's original February Request sought records that "*relate[d] to both* David MORALES and President John F. KENNEDY."  (Dkt. No. 28-1 Ex. 1) (emphasis added).  Besides the NCS and DS databases, the CIA also searched a database comprised of records collected under the JFK Act.  (Supl. Lutz Decl. ¶ 5.)  The JFK database contains documents that were originally generated outside of the CIA's headquarters.  (*Id.* ¶ 6.)  Given the limitation in Bothwell's initial request, the CIA's search of the JFK database was likely to produce responsive documents, and the CIA is not required to search additional offices.

In sum, there are still inconsistencies and ambiguities in the record that prevent the Court from granting summary judgment as to the adequacy of the CIA's search.  To clarify the record, the CIA must submit an additional affidavit that clearly explains: (1) the databases searched by the NCS and DS, including detail about the framework of the databases, the files contained therein, and the search parameters used; (2) why the NCS search "did not locate any records that reflected an open and acknowledged CIA affiliation," as compared to the DS search that "did not locate any records that were responsive;" and (3) what database of paper records Lutz refers to in her supplemental declaration, and why it was not discussed in her original declaration.

**B.      Glomar Response to Souetre Records**

The FOIA contains nine exemptions that the government may invoke to protect certain documents from public disclosure.  5 U.S.C. § 552(b).  "Unlike the disclosure provisions of FOIA, its statutory exemptions must be narrowly construed." *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004) (internal citations and quotation marks omitted).  A government

agency may issue a Glomar Response, however, and "refuse to confirm or deny the existence of certain records, if the FOIA exemption would itself preclude the acknowledgment of such documents." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996).

The CIA bears the ultimate burden of proving that a particular document falls within one of the nine statutory exceptions to the disclosure requirement. *Minier*, 88 F.3d at 800. The CIA may submit affidavits to satisfy its burden, but "the government may not rely upon conclusory and generalized allegations of exemptions." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995). While entitled to some deference, affidavits must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of CIA bad faith." *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992). "In evaluating a claim for exemption, a district court must accord substantial weight to CIA affidavits, provided the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of CIA bad faith." *Minier*, 88 F.3d at 800.

Here the CIA claims that its Glomar Response to the request for Souetre records was proper under Exemptions 1 and 3 of FOIA. Aside from general attacks on the detail and credibility of the Lutz Declaration, Bothwell argues that the CIA's Glomar Response is fatally flawed in that: (1) a redaction could suffice; (2) there is profound public interest in disclosure of the records; and (3) there is evidence that the CIA previously released records on Souetre. The Court will address each party's arguments in turn.

### 1.   FOIA Exemptions

#### i.   *Exemption 1*

FOIA Exemption 1 excludes disclosure of information classified or authorized to be classified "under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1). Here, the CIA relies on EO 13,526, which states in Section 3.6 that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records *whenever the fact of their existence or nonexistence is itself classified* under this order or its predecessors." Exec. Order No. 13,526, 75 C.F.R. 707 (2010)

14

(emphasis added).  Section 1.1 of EO 13,526 sets forth the four criteria that must be met for the classification of national security information:

> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

*Id.*  "Though an executive agency's classification decisions are accorded substantial weight, the FOIA permits challenges to Exemption 1 withholdings, requires the district court to review the propriety of the classification, and places the burden on the withholding agency to sustain its Exemption 1 claims."  *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991).  The CIA relies on the Lutz Declaration to do so here.

Lutz has averred in her affidavit that the existence or nonexistence of records on a foreign national, such as Souetre, is a classified fact that meets the four elements of Section 1.1 of the EO.  (Lutz Decl. ¶¶ 39, 51.)  As the Chief of the CIA's Litigation Support Unit, Lutz holds original classification authority pursuant to EO 13,526.  (*Id.* ¶ 2.)  Lutz determined that the existence or nonexistence of such records concerns "intelligence activities" and "intelligence sources and methods" listed in Section 1.4 of the EO, and that any such records would be under the control of the U.S. Government.  (*Id.* ¶ 51.)  Lastly, Lutz professed that the "unauthorized disclosure of the existence or nonexistence of requested records reasonably could be expected to result in damage to national security."  (*Id.*)  Specifically, Lutz states that the disclosure could harm national security by:

> disclosing whether or not the CIA has or had an intelligence interest in Souetre or his associates, disclosing whether or not [the] CIA engaged in intelligence operations involving them and the location of those operations, and indicating to [the] CIA's adversaries how [the] CIA would or would not choose to focus its intelligence activities on other individuals . . . .

> indicating whether or not [the] CIA maintained any human intelligence sources related to an interest in Souetre and identifying the access or lack of access any such sources had to intelligence concerning him . . . .

> alerting individuals of intelligence interest to what methods the CIA employed or did not employ with regard to [Soeutre], thus allowing those individuals to determine what countermeasures, if any, to take in the future to thwart CIA intelligence collection and activities.

(*Id.* ¶¶ 54, 58, 64.)

Bothwell claims that Lutz and the CIA take a "scattergun" approach, and "fail[] to focus reasonably on any particular rationales from among the galaxy of theories that could ever be proffered in FOIA cases, but instead list[] every one that can be conceived." (Dkt. No. 29 at 11–12.) While he does not challenge any of the other three elements of EO 13,526, Bothwell takes particular issue with the CIA's claims that acknowledging the existence or nonexistence of 51-year old records could endanger the United States. (*Id.* at 11–12, 14.) In Bothwell's view, "Lutz' premise that simply telling whether or not an October 1963 document exists would constitute a revelation as to CIA plans in the 21st century is, on its, face, illogical [and] implausible." (*Id.* at 14.)

The Court need not decide the difficult question of whether disclosing the existence or nonexistence of an intelligence interest in a foreign national 50 years ago could reasonably be expected to result in damage to national security. Because, as explained below, the CIA has provided sufficient reasons for invoking FOIA Exemption 3, the applicability of Exemption 1 is moot. *See Minier*, 88 F.3d at 800 n.5 ("Because we find that Exemption 3 exempts the information, we do not address the applicability of Exemption 1."); *Hunt*, 981 F.2d at 1118 ("We need not decide in this case whether exposure of the Agency's 'sources and methods' equals 'damage to the national security' under Exemption 1 . . . [where] Exemption 3 provides sufficient grounds to hold in favor of the Agency.").

### ii.     *Exemption 3*

FOIA Exemption 3 permits government agencies to maintain the secrecy of information that is "specifically exempted from disclosure by statute . . ., if that statute . . . establishes particular criteria for withholding or *refers to particular types of matters* to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii) (emphasis added). To determine whether Exemption 3 applies, the Court must determine: (1) whether there is a statute within the scope of Exemption 3; and (2)

whether the requested information falls within the scope of such a statute. *CIA v. Sims*, 471 U.S. 159, 167 (1985). Here, the CIA claims that its Glomar Response is proper under Exemption 3 because Section 102A(i)(1) of the NSA and Section 6 of the CIA Act prevent the disclosure of intelligence methods and sources. *See* 50 U.S.C. §§ 3024(i)(1), 3507.

Section 102A(i)(1) of the NSA calls for the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). This "clearly '*refers to particular types of matters*' . . . and thus qualifies as a withholding statute under Exemption 3." *Sims*, 471 U.S. at 167 (emphasis added).[4] Section 6 of the CIA Act similarly provides that:

> in order further to implement section 3024(i) of this title that the Director of National Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the Agency shall be exempted from the provisions of . . . any other law which require the publication or disclosure of the . . . functions . . . [of] the Agency.

50 U.S.C. § 3507. This language also "clearly identif[ies] the types of material to be withheld under [its] scope scope as required by 5 U.S.C. § 552(b)(3)." *Minier*, 88 F.3d at 801;[5] *see also Sims*, 471 U.S. at 193 (Marshall, J. concurring) (identifying Section 6 of the CIA Act as an exemption from FOIA). Thus, both statutes invoked by the CIA qualify under Exemption 3, and the only remaining question is "whether the requested information falls within the scope of these two statutes." *Minier*, 88 F.3d at 801.

Unlike EO 13,526 invoked under Exemption 1, neither the NSA nor the CIA Act require the CIA to determine whether the disclosure of information could reasonably result in harm to national security. *See* 50 U.S.C. §§ 3024(i)(1), 3507. Instead, the NSA provides the Director with "very broad authority to protect all sources of intelligence information from disclosure." *Sims*, 471 U.S. at 168–69. "Because of this sweeping power, courts are required to give great deference

---

[4] At the time of *Sims*, this language was codified at Section 102(d)(3) of the National Security Act, 50 U. S. C. section 403(d)(3), and referred to the Director of Central Intelligence rather than the Director of National Intelligence. The reclassification and "change in titles and responsibilities ha[ve] no impact on this case." *Berman v. CIA*, 501 F.3d 1136, 1140 n.1 (9th Cir. 2007).

[5] Section 6 of the Central Intelligence Agency Act was previously codified at 50 U.S.C. section 403g.

United States District Court
Northern District of California

to the CIA's assertion that a particular disclosure could reveal intelligence sources or methods."
*Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007) (internal citations and quotation marks
omitted).  "The term 'sources' is to be broadly construed and . . . reaches all sources of
information the CIA relies upon, including publicly available information." *Id.* (internal citations
and quotation marks omitted).  As result of this great deference, there exists "a near-blanket FOIA
exemption" for CIA records.  *Hunt*, 981 F.2d at 1120.  Nevertheless, the CIA's affidavits must still
contain "reasonably specific detail [to] demonstrate [that] the information withheld logically falls
within the claimed exemptions." *Hunt*, 981 F.2d at 1119.

In her declaration, Lutz stated that "acknowledging the existence or nonexistence of
records reflecting a classified connection to the CIA would reveal information that concerns
intelligence sources and methods, which the [NSA] is designed to protect."  (Lutz Decl. ¶ 66.)
Moreover, such an acknowledgement "would require the CIA to disclose information about its
functions, an outcome the CIA Act expressly prohibits."  (Lutz Decl. ¶ 67.)  She explained that:

> if the CIA were to confirm the existence of responsive records
> relating to Souetre in this case, such confirmation would indicate
> that the CIA had an intelligence interest in him.  On the other hand,
> if the CIA were to respond by admitting that it did not possess any
> responsive records, it would be indicating that the CIA had no
> intelligence interest in him . . . . [E]ither confirmation would reveal
> sensitive information about the CIA's intelligence interests,
> capabilities, authorities, and resources that is protected from
> disclosure by . . . statute.

(Lutz Decl. ¶ 46.)  The Lutz Declaration thoroughly discusses the CIA's reasoning behind not
disclosing information that could reveal targets and methods of intelligence gathering.  (Lutz Decl.
¶¶ 40–68.)  Given the "great deference" CIA affidavits are afforded, these rationales appear to
"logically fall within the claimed exception." *See Hunt*, 981 F.2d at 1119.

Moreover, when addressing FOIA requests seeking similar information from the CIA, the
Ninth Circuit has consistently found a Glomar Response to be proper under Exemption 3. *Minier
v. CIA*, 88 F.3d 796 (9th Cir. 1996) (finding Glomar Response to FOIA request on an individual
allegedly involved in a CIA plot to assassinate President John F. Kennedy to be proper under
Exemption 3); *Hunt v. CIA*, 981 F.2d 1116 (9th Cir. 1992) (finding Glomar Response to FOIA

United States District Court
Northern District of California

18

United States District Court
Northern District of California

request on the existence of records pertaining to a foreign national to be proper under Exemption 3).

In light of these precedents, and the substantial weight given to CIA affidavits, the Lutz Declaration adequately supports the CIA's conclusion that a Glomar Response is required.  The NSA provides that the Director of the CIA shall "protect intelligence sources and methods from unauthorized disclosure," and the requested information on Souetre falls within the broad scope of this statute.  Requiring the CIA to confirm or deny the existence of a classified relationship with a foreign national runs the danger of revealing an intelligence source, method, or target.  *See Hunt*, 981 F.2d at 1119 ("To confirm or deny the existence of records on [a foreign national] could therefore reveal intelligence sources or targets."); *cf. Sims*, 471 U.S. at 169 ("Disclosure of the subject matter of the [CIA]'s research efforts and inquiries may compromise the [CIA]'s ability to gather intelligence as much as disclosure of the identities of intelligence sources.").  In addition, consistent use of the Glomar Response is necessary for the CIA to keep its intelligence-gathering "mosaic" whole.  *See Hunt*, 981 F.2d at 1119 ("Through the CIA's disclosure of the existence or non-existence of records on particular individuals, a FOIA requester could make the information public or otherwise available to counter-intelligence operations from other nations . . . [who] could then determine the contours and gaps of CIA intelligence operations.").

### 2.      Bothwell's Contentions

Bothwell does not directly attack the applicability of FOIA Exemptions 1 and 3.  Apart from alleging that the Lutz Declaration is too conclusory as discussed above, Bothwell principally argues that the Glomar Response is improper because: (1) a redaction could suffice; (2) there is evidence that the CIA previously released records on Souetre; and (3) there is profound public interest in disclosure of the records.  The Court will address each argument in turn.

#### i.      *Redaction*

Bothwell relies on *New York Times v. U.S. Dep't of Justice*, 752 F.3d 123 (2d Cir. 2014), for the proposition that intelligence sources and methods could be redacted from any responsive records regarding Souetre.  (Dkt. No. 29 at 10.)  Bothwell misconstrues the holding of that case,

19

1   however, when he states that "[t]he court found that 'it is entirely logical and plausible that

2   intelligence sources and methods could be redacted . . . .'"  (*Id.*)

3          In *New York Times*, the Second Circuit ordered the disclosure of a redacted Memorandum

4   ("OLC-DOD Memo") that outlined the legal justifications for targeted drone killings on foreign

5   soil.  752 F.3d at 144.  The lower court acknowledged that it was "entirely logical and plausible

6   that [intelligence sources and methods] could be redacted from the legal analysis" of the OLC-

7   DOD Memo after in camera review, but ultimately found that "in camera inspection would be

8   pointless . . . because Exemption 5 plainly applie[d]."  *New York Times v. U.S. Dep't of Justice*,

9   915 F. Supp. 2d 508, 540–41 (S.D.N.Y. 2013).  On appeal, the Second Circuit agreed with the

10  district court that the OLC-DOD Memo "was properly classified" and that no operational details

11  should be disclosed.  *New York Times*, 752 F.3d at 136.  With respect to the memo's legal

12  analysis, however, the court found that waiver of the FOIA exemptions had occurred after the

13  district court's ruling by way of public disclosure.  *Id.* at 136–37.  Specifically, a leaked DOJ

14  document and several public statements by government officials had already revealed the

15  government's legal justification at issue.  *New York Times*, 752 F.3d at 133.

16         The reasoning in *New York Times* is not applicable here, as there are no recognized

17  documents available for redaction.  Here the classified information is the mere *existence or

18  nonexistence* of responsive records on Souetre, not the information contained in any potential

19  documents on him.  Requesting in camera inspection would require the CIA to admit that it has

20  records on Souetre, a fact that this Court has already determined is exempt from disclosure under

21  Exemption 3.  Thus, there is no possibility of redaction in this case.

22                          *ii.      Prior Disclosure*

23         "Voluntary disclosure of documents, either in whole or in part, to third parties has

24  sometimes been held to waive FOIA exemptions for those documents."  *Mobil Oil Corp. v. U.S.

25  EPA*, 879 F.2d 698, 700 (9th Cir. 1989); *see also New York Times*, 752 F.3d at 136–37 (finding

26  FOIA exemptions waived after public disclosure of information contained in confidential

27  memorandum).  Bothwell asserts that the CIA has already recognized an intelligence interest in

28  Souetre, in that "[s]cholars and investigative journalists have reported that the CIA officials in the

United States District Court
Northern District of California

20

1    past have publicly released one or more documents concerning Souetre."  (Dkt. No. 29 at 13.)  In

2    support of this contention, Bothwell points to two internet articles that suggest the CIA released a

3    document in 1977 that contained information on Souetre.  (Dkt. No. 29 Exs. 11–12.)

4         Federal Rule of Evidence 201 provides that the Court "may judicially notice a fact that is

5    not subject to reasonable dispute because it: (1) is generally known within the trial court's

6    territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

7    accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Courts may take judicial notice

8    of newspaper and online articles in order to determine "what was in the public realm at the time,

9    [but] not whether the contents of those articles were in fact true."  *Von Saher v. Norton Simon*

10   *Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).  To accept such articles for the

11   truth of the matter asserted would be improper hearsay.  *See* Fed. R. Evid. 801(c)(2), 802; *DMC*

12   *Closure Aversion Comm. v. Goia*, No. 14-CV-03636-WHO, 2014 WL 4446831, at *8 n.12 (N.D.

13   Cal. Aug. 29, 2014) ("[P]laintiffs' attempt to request judicial notice of newspaper articles and

14   other media accounts a[re] improper hearsay.").  Thus, the two references that Bothwell provides

15   are hearsay and cannot be used to prove that the CIA released a document on Souetre in 1977.

16        Even if the articles were admissible, official acknowledgements must meet three criteria to

17   waive a FOIA exemption: (1) "the information requested must be as specific as the information

18   previously released;" (2) "the information requested must match the information previously

19   disclosed;" and (3) "the information requested must already have been made public through an

20   official and documented disclosure."  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).

21   Bothwell's reference to an unidentified document produced in 1977 is not sufficient to meet these

22   factors.

23        Hence, Bothwell has not pointed to any public disclosures regarding Souetre that would

24   constitute a waiver of Exemption 3.

25                          *iii.*      *Public Interest*

26        Bothwell additionally argues that the profound public interest in records concerning

27   persons of interest in the assassinations of President John F. Kennedy and Senator Robert F.

28   Kennedy makes the CIA's Glomar Response inappropriate.  Congress recognized this interest in

enacting the JFK Act, which states that "all Government records concerning the assassination of President John F. Kennedy should carry a presumption of immediate disclosure." JFK Act § 2(a)(2). Notwithstanding this congressionally recognized interest in disclosure, "there is nothing to suggest that Congress intended the JFK Act to override the CIA's ability to claim proper FOIA exemptions." *Minier*, 88 F.3d at 802; *see also Assassination Archives and Research Center v. U.S. Dep't of Justice*, 43 F.3d 1542, 1544 (D.C. Cir. 1995); ("There is no evidence that Congress intended that the JFK Act standards be applied to FOIA review of documents involving the Kennedy assassination."). While it is "undoubtedly true that the JFK Act was motivated by less than adequate FOIA responses to Kennedy assassination record requests," it is also true that "Congress evinced an intent that the JFK Act would not affect the functioning of FOIA." *Minier*, 88 F.3d at 802–03.

Ms. Lutz claims in her supplemental declaration that the CIA conducted a limited search on Souetre to determine whether there were any responsive documents previously released under the JFK Act. (Supl. Lutz Decl. ¶9.) Once no responsive documents were found in that database, the CIA was justified in invoking its Glomar Response. The Court recognizes the profound public interest in learning about the Kennedy assassinations, but this does not "override the CIA's ability to claim proper FOIA exemptions." *See Minier*, 88 F.3d at 802.

To conclude, Bothwell has not presented any evidence that undermines the legitimacy of the CIA's Glomar Response, and the CIA was thus justified in refusing to confirm or deny the existence of records on Souetre under Exemption 3 of the FOIA.

## CONCLUSION

For the reasons set forth above, the Court concludes that it does not have enough information to determine whether the CIA's search for records concerning Roselli, Morales, Cesar, and Hernandez was adequate, but that the CIA issued a proper Glomar Response in response to the Souetre records under Exemption 3 of the FOIA. As such, the CIA's Motion for Summary Judgment (Dkt. No. 28) is GRANTED in part and DEFERRED in part. The CIA is instructed to submit an additional declaration that clarifies the outstanding issues, as explained

United States District Court
Northern District of California

above.  The parties shall meet and confer on a schedule for supplemental briefing and submission of evidence and submit a stipulation to the Court on or before October 31, 2014.

        **IT IS SO ORDERED.**

Dated: October 9, 2014

                                        _____
                                        JACQUELINE SCOTT CORLEY
                                        United States Magistrate Judge

United States District Court
Northern District of California

23